By the Court. Campbell, J.
The bill in this case was filed, for the purpose of determining the rights to wharfage, accruing on the outermost ends of piers 19 and 20 ; the former being on the easterly side of the slip at the foot of Maiden-lane, formerly called Fly Market-slip; and the latter lying on the westerly side of Burling-slip, in the city of Mew York.
Upon the argument of the cause, the powers and rights of the corporation, in reference to wharfage, and the building of piers, slips, and wharves, derived from colonial charters and acts of the legislature of the state,were discussed and reviewed with signal ability and learning. A reference to those charters, and to the early acts of the legislature, while it becomes necessary in the deci *496 sion of this case, will serve also to show the enlarged views entertained in former times by the municipal rulers, of the commercial importance and advantages of this city, in the provision which they sought to make for the accommodation of that commerce, which, in our day, is literally whitening every ocean with its canvass, and vexing every sea with its keels.
The charter of Dongan, in 1686, recited, that the citizens and inhabitants had, among other things, erected and built the “bridge into the dock, the wharves and docks, with their appurtenances,” and it ratified and confirmed the title to the corporation ; and in the Montgomery charter, in 1130, the original grants are confirmed and ratified, and new grants made, embracing among other things, “ all the waste, vacant, unpatented, and unappropriated land, lying and being within the said city of New York and on Manhattan’s Island aforesaid, extending to low water mark; together with the right, benefit, and advantage of all docks, wharves, cranes, and slips, or small docks, within this city, with wharfage, cranage, dockage, and all issues, rents, profits, and advantages arising, or to arise or accrue, by or from all, or any of them.” By this same charter also, was granted the land under water, extending four hundred feet from low water mark, into Hudson’s and East Eivers, beginning at Bestaver’s EUlitie on the former, and running round to Corlaers’ Hook on the latter river.
Such were the grants under the charters, when the act of the third of April, 1198, was passed by the legislature, upon the petition of the common council. That petition stated, that the corporation had directed permanent streets, seventy-five feet in width, to be laid on the North or Hudson’s and on the East Eivers; the former, on the Hudson, to be called West-street, and the latter on the East Eiver, to be called Soiith-street; west and south of which streets, no buildings would be permitted to be erected; that these streets were at and on the extremity of the grants made to individuals by the corporation, and that a part of the plan of the corporation was to extend piers at right angles from those permanent streets into the rivers, at proper distances from each other, to be determined by the corporation, with suitable bridges for the accommodation of sea vessels, and *497 so constructed as to admit the currents at both ebb and flood, in both rivers, to wash away all impurities; that doubts had arisen, whether the corporation could compel individuals to sink and lay out those piers, and whether the corporation, in default of individuals, could do it themselves, at the expense of the city, and receive the wharfage.
The fifth section of the act of 1798, declared “ that it shall and may be lawful for the said mayor, aldermen, and commonalty to direct piers to be sunk and completed at such distances and in such manner as they, in them discretion, shall think proper, in front of the said streets or wharfs, to be so made as aforesaid, and to be connected with the same by bridges, at the expense of the proprietors of the lots lying opposite to the places where such piers shall be directed to be sunk, and by such days and times as the said mayor, aldermen, and commonalty may, for that purpose, limit and appoint,” &c., and in case of default, then the corporation was authorized to sink the piers and receive the wharfage to their own use.
On the 3d April, 1816, the act of 1798 was re-enacted, with additional powers, among which was the power given to the corporation to grant to the owners of lots fronting on the streets forming the permanent outer line, a common interest in the piers to be sunk in front of such streets, in proportion to the breadth of their respective lots, under such restrictions, and within such limits as the mayor, aldermen, &c. should deem just and proper. A large number of grants had previously been made by the corporation to individuals, many of which extended to South-street, the permanent outer street, and which marked the exterior line of the original grants to the corporation under the charters. Tim piers extending at right angles to this street, would of course be built upon land belonging to the state. In the case of the Corporation of the City v. Scott, 1 Caines’ Rep. 543, a question arose as to the right of wharfage, accruing from one side of a pier which had been built on the corner of Wall and South streets, under an ordinance of the corporation, founded on the acts of the legislature, before referred to. At the foot of Wall street was a public slip belonging to the corporation; and in the ordinance, directing and authorizing the building of this pier, the corporation *498 reserved to themselves the wharfage or slipage, which might accrue on the side of such pier adjacent to the slip. The court decided in that case, that the corporation had no right to such wharfage, because the land on which the pier was erected was ■ never granted to them; that no implied grant was contained in the acts of the legislature, and that the corporation were only to grant to others, as attorneys of the public, in case piers were sunk, and that in the reservation of wharfage to themselves in the ordinance, they had exceeded their powers, and that such reservation was not binding on the owner. This ease was one of great interest and importance to the city, and it was argued by four of the most distinguished men who were at the bar in this state, at the commencement of the present century.
The case of the Corporation v. Scott, was decided in February, 1804; and in April, 1806, another act was passed by the legislature, the second section of which is in the following words :■—■ “ That in all cases, where the said mayor, aldermen, and commonalty shall think it for the public good, to enlarge any of the slips in the said city, they shall be at liberty and have full power so to do, and upon paying one third of the expenses of building the necessary piers and bridges, shall he entitled not only to the slipage of that side of the said piers which shall be adjacent to such slips respectively, but also to one half of the wharfage to arise from the outermost end of the said piers.”
It was under the power given in the foregoing section, that the piers 19 and 20 were first sunk in 1809, at the joint expense of the corporation and the owners of the lots on South street, under an ordinance adopted on the petition of those owners. As the power is given to enlarge any of the slips, it was contended, that the sinking of the piers in question was not such enlargement; and it was sought to bring this case within the decision of the supreme court, in the case of the Corporation v. Scott. The word slip, is said to be peculiar to this state in its application to structures or places for the accommodation of vessels. The word' is used in some of the old colonial acts and in the Montgomery Charter, in the extract hereinbefore given, in which, among other things, the corporation is declared to be the owner of the slips or small docks.
*499 In the case of the Corporation v. Scott, definitions were given as follows, by Mr. Eiggs, counsel for the city: “The piers, (which form, the slips,) are under direction of the corporation,” &c. By the court: “ This is no slip, which is an opening between two pieces of land or wharves.” By the reporter: “ A slip is an interval or vacancy between two piers.” We may adopt the definition given by the court as the correct one. But after all, it does not appear to us to be very material, for the act seems to point out the precise manner in which the slips were to be enlarged ; especially when taken in connexion with the acts of 1798 and 1801, and the facts and decision of the case in 1st Caines, so often referred to. Piers 19 and 20 were not slips, any more than the pier built at the foot of Wall street, but they were extensions of the sides of Fly Market and Burling slips.
It seems to be the mode of enlargement contemplated by the statute of 1806, if the corporation should think it for the public interest to enlarge any of the slips, they should have power so to do; and on paying one third the expense of building the necessary piers, bridges, &c. should be entitled to the slipage of that side of the new piers adjacent to such slips. It certainly could not have contemplated an enlargement by widening, but by carrying out piers in the mode provided in the acts of 1798, as had been done on the corner of Wall and South streets. It must be borne in mind, that in 1804, the corporation owned all the public slips, at least so it was conceded by all the counsel engaged in the cause of the Corporation v. Scott; and in building these piers, the corporation did under the law of 1806, what they could not do under the laws of 1798 and 1801, except, that in that case, they reserved wharfage without contributing any portion of the expense; and in this case they paid one third.
That the corporation paid less than the owners of the land from which the piers were extended, may have been owing to a variety of circumstances; such extensions producing an increase of business, may have added to the value of the lots fronting on South street and those slips. The state was the owner of the land on which the piers were built, and gave a power to the corporation for its use, in connexion with the owners of the lots; *500 and the legislature fixed the proportion of expense to be borne, and the proportion of the profits to be enjoyed by each.
We are therefore of opinion, that the building of those piers . was legal, and authorized under the act of 1806 and previous acts. It is hardly necessary to add, that the addition of a pier to one side of a slip, in our judgment, must necessarily operate as an enlargement, even though no corresponding pier is extended from the other side of the same slip. The law of 1806, was re-enacted in 1813 in the revised laws of that year; and in 1839, a further extension of those piers took place again, with the consent of the owners, except so far as such consent was qualified by the conditions attached.
It is only under this agreement with the corporation, that the plaintiffs obtain the right to a portion of the wharfage. If these piers were not .proper enlargements of the slips, then it would seem that the plaintiffs fail to establish any title in themselves, as the land and wharfage would belong neither to them nor to the corporation, but to the state ; and thus failing in title, they cannot of course recover in this suit against the corporation. But as before remarked, we consider the title of the plaintiffs and the corporation as perfect under the acts referred to; and we shall proceed to the other important question in the case, that is, whether the plaintiffs are entitled to the entire wharfage derived from the outermost ends of those piers. The plaintiffs claim that they have enjoyed such wharfage from the first sinking of the piers in 1809 ; and that in the extension of 1839, they assented on the condition that their exclusive rights to such wharfage derived from the outermost end of the piers should be reserved to them; in other words, the plaintiffs claim title to the exclusive enjoyment of such wharfage, by prescription, founded on more than thirty years possession prior to 1839, and a reservation of such title in the proceedings in 1839.
The defendants answer, that they and the complainants were tenants in common; and that there has been no actual ouster. That the defendants never acquiesced in such exclusive enjoyment by plaintiffs, that if plaintiffs had acquired a title previous to 1839, the new proceedings for enlargement of the slips by a *501 further extension of the piers, restored the right of the corporation to the one-half of such wharfage; and lastly, that there is no sufficient proof to warrant the court in presuming a grant. It will at once be seen, that the presumption of a grant lies at the foundation of the plaintiffs’ title. If there has been no grant, or none can be fairly presumed, they must fail; and it is only on this .presumption, that it may become necessary to consider whether, by the proceedings in 1839, the plaintiffs lost the rights which they claim they had previously acquired by prescription. Whether or not a grant will be presumed, is peculiarly the province of a jury to determine; and after a most earnest and careful consideration of this question, looking at the testimony which is before us, and to the nature of the claim, we have come to the decided conviction, that our duty in this case is to send that question to a jury.
It is very evident, that further testimony should be produced, if the same can be procured, in order to effect a satisfactory decision of the cause. The proof of an uninterrupted perception and appropriation of the wharfage from 1809 to 1840 by the plaintiffs, if they succeed in adducing it, will of course affect the question of tenancy in common. It is, we think, hardly to be denied, that an uninterrupted exclusive enjoyment of the wharf-age for so long a period, under claim of title, would be evidence of ouster against a tenant in common. Whether there has been such an exclusive and uninterrupted enjoyment, with the knowledge and acquiescence of the defendants; and whether, upon clear and satisfactory proof of it, a jury will presume a grant, are questions which should be left to their determination.
The question to be submitted to the determination of the jury, will be whether the plaintiffs, and those under whom they claim, had acquired, by prescription, an exclusive right to the whole of the wharfage at the outermost end of the piers, previous to the date of the agreement, in 1839; und all other directions will be reserved.